Good morning, Your Honors. I'd like to reserve two minutes for rebuttal, please. Are you a law student? I'm sorry. Yes, I am. May it please the Court, my name is Angie Quick, and I, along with co-counsel Anthony Gerase, are students from Chapman University School of Law, pro bono appointed counsel for the petitioner, Mrs. Eliza Zakarian. We are here under the supervision of Professors Kim Penfill and Peter Aficiabi, both admitted to practice in this court. I will address the persecution argument, and Mr. Gerase will address the APA argument. Your Honors, Mrs. Zakarian is a 78-year-old Armenian national who credibly testified that the government targeted her because of her religious beliefs. This court should reverse the decision of the BIA and grant Mrs. Zakarian asylum for two reasons. Number one, she provided substantial evidence that she suffered persecution on account of her religion. And number two, this entitles her to a presumption of a well-founded fear of future persecution. Counsel, since your time is short, would you show me or indicate where in the record does the petitioner explicitly say that she's fearful of going home because of religious persecution? That she's fearful of going home, Your Honor? Yes. Should she be forced, I say, home, Armenia, her original home. Where in the record does the petitioner explicitly say? For instance, at one time, she says, if I return to Armenia, I have no place. I have no home. Everything is destroyed. It is destroyed, and it was bombarded by Azerbaijan attacks. Second time, she says, I don't have anybody there. I don't know. I don't know. I don't know what would happen. I'm having difficulty finding anything in the record to show that she's fearful of religious persecution. Could you direct me to that? Your Honor, what the record tells us from her comments that Your Honor just stated is that her fear of going back to Armenia is because the future is uncertain and that she does not know what will happen to her. It is true that she does not expressly state that she fears going home because of continued religious persecution, but this can be inferred from the information that is contained in the State Department. Does that ultimately matter? My understanding of the current regulations is that if we thought there was past persecution, which I'd like you to explain to us why we should think that, then the burden shifts. But not only that, she might be entitled to asylum even if she didn't have a well-founded fear of future persecution if she feared other serious harm. Is that my right about the regulations? Yes, Your Honor. Yes. And we would argue that under the Chen doctrine, which is now codified in the Code of Federal Regulations, that based on Mrs. Zakarian's past persecution alone, that this Court can grant her asylum even if she fears Well, can we or can't? I'm not sure we can. It seems to me that that is committed to the discretion of the agency, but the agency could. Yes. So if we thought that the IJ was wrong about past persecution, we could then send it back to the agency and say decide whether to exercise your discretion under subsection such and such, which I don't know what it is, with regard to humanitarian reasons for asylum. Is that right? Yes. So therefore, a lot turns on past persecution. Could you help us with that? Yes, Your Honor. In the record, Mrs. Zakarian testified at the very beginning on page 82 of the record that she suffered persecution or she suffered problems with the government because she was a Protestant. She then testified to several incidents taking place during her time in Armenia, including detentions coupled with physical harm, threats to family members. But those were all years ago, were they not? Yes, Your Honor. Many years ago? Yes. I mean, 1963, 64? However, as early as in the 80s, the government confronted her and told her that her daughter-in-law, who was a recent convert into the evangelical faith, had to leave Armenia or else be killed. So it shows that this Did they use those words, be killed? Yes, Your Honor. It is in the record. Did they use those words with respect to Petitioner? With respect to her daughter-in-law, Your Honor. But the confrontation was to Mrs. Zakarian. They told her, your daughter-in-law has to leave Armenia or else she will be killed. I'm not clear if that was because of the religion or because of, wasn't she Turkish, I believe, the daughter-in-law? Yes, Your Honor. However, she was a recent, she was recently baptized into the evangelical faith. So Mrs. Zakarian's understanding of that confrontation was because, not because of her ethnicity, but because of her being recently converted into the evangelical faith. And so all of these incidents that Mrs. Zakarian testified to, in line with this Court's case law on what constitutes persecution, shows that Mrs. Zakarian has, in fact, established a case of past persecution. And as Your Honor has noted, where there is past persecution, even if this Court does not find a well-founded fear of future persecution, this Court may nonetheless grant or remand back to the BIA for a finding of, for a grant of asylum based on the past persecution alone. But the past persecution, A, as Judge Mahan says, is extremely old, although I'm not sure. Is there any case law that suggests that that matters? No, Your Honor. Second of all, it consisted, as I understand it, of basically the following. She was detained for 36 hours or so, and hit in the face, and broke her dentures. And that's sort of it, in terms of physical stuff, because the other incident was really, she fell over something and broke her arm. Nobody broke her arm, as I understand it. There was dispersing people, and in the flurry, she fell over something and broke her arm. So as far as I can tell, the physical, physical injury that was that, and detention was that one incident. And then there are things that happen to other people, like her daughter, a threat about her daughter-in-law, her husband, and so on. And then there was very, very vague threats of indeterminate amounts and indeterminate meaning. If you don't do this, you're going to get lost. In addition to that, Your Honor, the government also persistently targeted her and her religious gatherings over the span of 30 years. Even when she worshiped in secret, the government still managed to find her. And it was during that attack that Your Honor noted where she broke her arm. That was at a cemetery, a secret meeting, a secret religious gathering, and yet the government still found her. And it was during that incident that she broke her arm. And so what this indicates, Your Honor, is that the government, no matter what Mrs. Zakarian did to privately worship or to keep her religious gatherings a secret, they still managed to find her. And this took place, according to Mrs. Zakarian, over the span of 30 years during her time in Armenia. And- Well, counsel, let's assume that there was past persecution. Isn't the only evidence that we have in the record is that country conditions have changed? Indeed, in June 1996, the Armenian Apostolic Church welcomed a delegation of the Armenian Evangelical Church. And this is the country conditions report. Assuming that there was past persecution, doesn't, it just creates a presumption of persecution. Doesn't that rebut the presumption? No, Your Honor, it does not. The State Department report does not talk about whether the Evangelical Church has in fact been a registered church. And if this church is not a registered church, that tells us, or the inference is that it can still pose risk to those who worship in the Evangelical faith to persecution, to harassment by the Armenian government whose state church is the Apostolic Church. So the main concern that Mrs. Zakarian faces that the fact that she is an evangelical Christian is not addressed by the State Department report because it does not state that the Evangelical Church is in fact a registered church. Ms. Quick, if you want to give some time to your colleague, you only have about a minute left. Thank you. Thank you. Thank you. Good morning, Your Honors. My name is Anthony Gerace, and I'll be addressing the APA argument. The streamlining rule violates the APA because streamlining judges only have 13 and a half minutes to adjudicate each appeal. Under the APA, this court should hold unlawful any agency action that is arbitrary and capricious. Here, 13 and a half minutes per case is arbitrary and capricious for two reasons. Well, I will give you some outside the record information because we recently had a meeting with the BIA, some member of the BIA, who informed us that in fact that's true, but they also have 125 staff attorneys who carefully go over every case before it is presented to the individual member who is working on it, write a careful memo. And so the person, I mean, and you would suspect this anyway, I mean, the BIA member is not starting from scratch in his 13 and a half minutes. He's starting from the fact that a staff member has carefully considered the case and has written a careful memo. Does that change your view? No, Your Honor. The Supreme Court has recognized that a significant liberty interest exists in an applicant not being, or excuse me, being free from unlawful deportation. So even though the staff attorneys carefully comb through the record, the judge must make the ultimate decision and must carefully comb through the record themselves. I see that, might I? Yes, go ahead. Well, we'll give you about three more minutes. Go ahead. Thank you, Your Honor. Which brings me to my first reason. Not only has the Supreme Court recognized a certain significant liberty interest exists, but this Court's own precedent recognizes that strict adherence to the APA is especially important in immigration proceedings for detects such a significant liberty interest. Turning to the case. That leads me to ask, how do you distinguish Falcon-Karish, where we clearly held that the streamlining procedure was constitutional? Well, yes, ma'am. However, the arguments in Falcon-Karish are distinct from these. First, the Falcon-Karish court was only presented with the argument of whether, under due process grounds, they were entitled to a three-member panel and an opinion itself. And on the streamlining rule challenge itself, Falcon-Karish argued that every case was a novel issue of fact under the streamlining rule itself. Here, we're saying that the streamlining rule violates the Administrative Procedure Act because 13 and a half minutes is just not enough time for BIA judges to be able to decide the appeals before them. Well, it may or may not be. I mean, your basic argument is that it's per se arbitrary and capricious to decide things as quickly as you're deciding them, even if the decisions are perfectly fine when you look at the whole record. Well, yes, Your Honor, especially because the record, for instance, in this case was 135 pages long. Actually, I'm not sure I spent more than 20 minutes on it. Usually I do, but this was a pretty easy one to get through. Yes, Your Honor. As you said, you usually spend more than 20 minutes per record. Exactly is that the record itself is very long. In fact, the First Circuit in Al-Bathani recognized that 10 minutes that they could not spend on the case itself and held that proof of systemic violation, such as the statistics show, the streamlining rule here, would hold the streamlining rule unlawful. Well, the 13 and a half minutes, as I understand it, is an average. Is that right? Yes, Your Honor. I mean, because a case that presents a lot of novel features, they might spend an hour or two hours on, and some case that the same arguments that have already been raised in other cases, already been decided, might get fewer than 13 minutes. So it's an average. Well, yes, Your Honor. We don't know exactly how many minutes that were spent on each case, and that's actually part of the problem. There's no transparency to say how many cases got 2 minutes, how many cases got 27. However, on average, which is evidence we have, 13 and a half minutes on average could not clearly be enough for the 44,000. It's certainly not an ideal system, but whether it per se violates the APA as opposed to on an individualized basis is really the question. I mean, one fallout of all this is that we're probably reversing a lot more of the IA decisions than we did before because we don't know what they decided and because they're not really – when there are problems with the IJ decision, they're not really fixing them, so in some ways it's beneficial to the Petitioners in a weird sort of a way. But I'm having trouble with your argument that this is a per se violation. Excuse me, Your Honor. Go ahead. I was just – I don't know about per se. I just can only say that it's arbitrary and capricious just because of the amount of time spent on each appeal itself. I guess my question is where are you getting – I mean, there's another peculiarity here, which is under the immigration, the INA, the BIA is not really even a statutory agency. It appears once in the statute kind of in passing. The discretion is really committed to the Attorney General. And so it's not like the National Labor Relations Board or the FCC or most of the alphabet agencies of the Court in the sense that there's no statute that says that it is that agency that's supposed to be making the decision. So you're making an assumption, which is that the BIA is supposed to have some statutory obligation to make this decision. Where are you getting that from? Well, Your Honor, it is based on the Administrative Procedure Act itself in that each rule must be promulgated based on protecting for the public so that they must give reasoned basis for everything. And, in fact, the Supreme Court of America … Well, their understanding of this rule is the reasoned basis is the IJ's decision and that the BIA is almost operating as a sort of, you know, certiorari kind of operation. And it's the IJ decision that's the reasoned rule. And that's really what Falcón-Carrillo says, doesn't it? Well, yes, Your Honor, but respectfully, I believe that's different from what we're arguing here. We're arguing that the — excuse me, the Supreme Court rule itself violates the Administrative Procedure Act because there's no reasoned basis, considering the fact that, on average, BIA agents only spend 13 and a half minutes per appeal. Thank you very much. I appreciate your argument. We'll give you two minutes to rebuttal. Thank you. May it please the Court, William Vinnick, representing the Respondent. The immigration judge found that Petitioner's treatment in Armenia amounted to harassment and discrimination that did not amount to past persecution, and there's no evidence in the record that compels a contrary conclusion. Well, Counsel, Petitioner was found credible, was she not? That's correct, Your Honor. Therefore, we — don't we have to take whatever she said as true? That's right, Your Honor. And that isn't sufficient when she said — she said she had repeated death threats, suffered physical abuse. Why doesn't this rise to the level of persecution? Your Honor, if I could, I'd just like to go through each of the incidents she testified to and discuss them individually. The first incident she testified to — I'd stop you here for one minute. Yes, ma'am. Do you attribute any statutory significance to the fact that the two incidents of assertive physical abuse, which you can talk about in a minute, were so long ago? Does that matter? Well, if the — if the incidents in the 1960s were so egregious that they amounted to past persecution — It wouldn't matter. It wouldn't matter if they were 30 years ago. Okay. But in the context of this case, where it amounted — the worst thing that happened to her was a two-day detention in which she was hit once and then she was never mistreated or at least arrested or injured for the next 30 years, I mean, it sort of puts that one incident in context. But Your Honor's correct. If she did establish an incident in the 1960s that amounted to past persecution, it wouldn't matter, and she would be entitled to the presumption of future persecution. It would make it easier, presumably, to rebut the presumption, but it wouldn't matter. Yes, ma'am. The first incident that Petitioner testified to was when she arrived in the country in 1963 and she claimed she wasn't permitted to live where she wanted to. Now, there's nothing in the record that suggests this was on account of her religion. The record doesn't even suggest that the people knew of her religion when they assigned her to live in a particular village. And this was government housing. In other words, it's not like she was prohibited from living in the place of her — the private home of her choice. She was afforded government housing by the government and just, you know, told the particular village to live in. The next incident that she testified to was in 1963. Her husband was detained by the KGB for five days. There's really no additional information that she testified to. There's nothing in the record to indicate that he was injured or mistreated during this five-day detention. The most that she said was he was told to shut up. She didn't even testify what he was told to shut up about. She didn't specifically testify that it was about her religion. The next incident was in 1964. Petitioner testified that her group was attacked by police while practicing their religion in a cemetery in secret. And she says that her arm was broken. Now, there's nothing in her testimony to suggest that she was singled out during this incident. When you read the testimony, it appears that it was just a raid on the cemetery. She wasn't singled out. And although she was injured, it was unintentional. Her testimony was that she got pushed or pulled, and she fell against a tombstone and broke her arm that way. And to the extent that the injury was unintentional, it wasn't on account of her religion. And she wasn't singled out. I don't understand the significance of singled out. If everybody – if they were raiding the cemetery because everybody there was practicing a forbidden religion, then everybody there was being singled out. Why does that matter? Well, that's a good point, Your Honor. I mean, she – maybe that doesn't matter, but the fact that the injury wasn't intentional, I mean, that sort of is dispositive of that particular incident. Okay. The next incident, she was detained for two days in 1964. She was hit in her face and her dentures were broken, but she did not provide any additional detail. She didn't say what they said to her. She didn't claim that other than being struck once in the face, she was mistreated or injured beyond that. And certainly the record as it is does not compel a conclusion contrary to the immigration judges that this one two-day detention in which she was struck once rises to the level of persecution. Did she hook that up to her religious beliefs? I don't remember. Did she say – was there something about it other than everything else that was going on? Well, she – she didn't specifically mention it with respect to that particular incident, but she – it was more like she offered a general statement at the beginning of the testimony. During that period. During that period. And she was credible, so, I mean, I think the record's clear. I think the immigration judge found that on account of her religion. Right. But nevertheless, the record doesn't compel, you know, a contrary conclusion to the immigration judge. Basically, our case law, as I understand it, is if there was some detention and physical manifestation and later – and also threats, that that's likely to be enough. So, I mean, is that a fair characterization? And one or the other might not do it, but here we have some detention, some physical manifestation. And then the question is, what about the asserted threats? The threat in – in 1988 when they threatened to kill her daughter, I did want to clear one thing up. The way – the way I read the record on page – record at page 87, the way I read the record, her daughter was baptized in 1970. I believe she testified that her daughter-in-law was married and baptized in the religion in 1970. And then the threat occurred in 1988. I think what she testified to was after the incident with the sumdat, at that point, they threatened her daughter in 1988. Now, it's not clear from the record what that incident is, but to the extent that that was her testimony, it's not even clear that her daughter-in-law was threatened because of her religion. And if – if she was, she had – she had been in that religion for 18 years and nothing happened to her. But the record sort of indicates that it might have been because of her daughter-in-law's Turkish heritage, because of whatever occurred in the sumdat. Even though – at any rate, the petitioner was not the subject of the threat. It was her daughter-in-law. And the threat was never acted on. The daughter-in-law and her husband were able to leave Armenia the next year in 1989, and they were never injured because of the threat. It was an un-unbefittable threat. MS. NIEUSMANN-FERSTENBERG I don't think they left because they took that threat seriously. So that's why they left it, or at least threats like it. But that's not really the threat I meant. MS. NIEUSMANN-FERSTENBERG I'm not sure if that's the right way to put it, but I'm not sure if that's the right way to put it. I mean, I think the question is, is that sufficient? I mean, she does say somewhat vaguely that many, many times she was told to stop practicing her religion or get lost. And the question is, is that sufficient? It's hooked up with the earlier detention and injury. MR. SHERIFF No, Your Honor. I mean, it's just – it's just too vague. It's too vague a statement. We don't – we don't have a clue, you know, if this occurred during the entire length of the 30 years she lived in Armenia. She also said in an equally vague fashion that she was able to practice her religion two or three times a week. MS. NIEUSMANN-FERSTENBERG Can I ask a different question? As I said, we did have this meeting with the BIA and IJs recently, and one of the issues we raised with them is what discretion does your office have and do they have when there's a situation in which one sort of questions the prosecutorial – has reason to question the prosecutorial decision to deport this person at all? We have here is a woman who, if you sent her back, will be over 80, I think, right, with absolutely nobody in Armenia and no way to support herself, apparently, or anything else. Do you have any discretion or is there any way in which either your office or perhaps with the help of our mediators you could sit down and see if there is some way to work out the situation? I understand that there's a long history to this and that she's eligible for citizenship and that the IJ seemed to be quite understanding and tried to work it out and it didn't work. Nonetheless, you know, looking at it as a dispassionate third party, this doesn't necessarily look like somebody that the United States should be spending its time deporting. I'm sympathetic to that concern, Your Honor. And our office, my litigation office at the Department of Justice, has no discretion with regard to whether the DHS goes forward with this or not. We did talk to our client in the course of this case, and they did indicate that they do want to go forward and proceed with this case. And if we were to suspend submission of this case for 30 or 60 days and ask you to sit down with our very competent mediators, do you think there would be any point in that? I do not, ma'am. At this point, the Petitioner has overstayed her voluntary departure. She does not have a stave removal from this Court. She was granted voluntary departure by the Board and she did not leave. So she's overstayed her voluntary departure. She's statutorily ineligible for adjustment status. She doesn't have a stave of her voluntary departure? I don't believe so, Your Honor, no. She doesn't have a stave removal of any kind from this Court. She doesn't have a stave removal or a stave voluntary departure. That's correct, Your Honor. I mean, that's my understanding. So at this point, she's statutorily ineligible for adjustment status for 10 years. Our client has indicated that they do wish to go forward. The fact of the matter is, is that to per the DHS to exercise their discretion to grant asylum, the Petitioner must demonstrate that she's a refugee in accordance with the statute. And the agency has determined that she has not demonstrated that she's a refugee. And there's no evidence that compels a consent. I did think, though, that there was some statute or some administrative procedure called suspension of deportation or something like that, where the agency could simply stop the proceeding as a matter of prosecutorial discretion. Is that not so? I'm sure you're right, Your Honor. That sounds right. But if you're asking whether I think that would – if there's a reason. We get contrary answers to this question. We're assured that there is discretion. And when we ask you guys, you always say there isn't. So it's a little difficult for us in terms of what the truth of the matter is. Your Honor, I see I'm just about out of time. I have a quick question.  I'm interested in the arguing conclusion. There's no record evidence that compels a contrary conclusion to the immigration judge. Do you want to briefly address the APA question? Take a couple minutes. Yes, Your Honor. We stand by the statement we're briefed that the APA does not apply to deportation hearings. Even if it does, it's a matter committed to agency discretion. In any event, their only argument for the idea that it's arbitrary and capricious is this notion of 13 and a half minutes. That's really their only argument. They advance. And as Your Honor pointed out, I mean, this is an average, so it's sort of a misleading statistic. They sort of talk about it like after 13 minutes, a buzzer goes off and the file is whisked away from the board member. But in reality, the board member can spend as long as he needs to or wants to with a case. And moreover, the regulation provides that the final agency action is the immigration judge's decision. And the immigration judge spent much longer than 13 minutes on the case. It's not like the petitioner didn't get her day in court. And that would be our position on the APA. Thank you very much. Thank you. We ask the Court to deny the petition. Thank you very much. Ms. Quick, we'll give you a couple minutes and wrap it up. What about the – is it true that she doesn't have a stay of departure, of deportation or a voluntary departure? Do you know? Your Honor, we believe that she does. However, we don't have the docket with us, so we can provide that information at a later time. It would be useful to let us know. Okay. And as to Your Honor's – And for you as well. And as to Your Honor's earlier concern about mediation, we would be happy to mediate and save resources on this matter. Just a few brief points. On page 82 of the record, Ms. Zakarian prefaced her testimony with a statement that each event to which she would testify was because of her religion. And under Garcia-Martinez v. Ashcroft, this Court's case, every fact that the – that a credible applicant testifies to must be accepted as true and any reasonable inferences therefrom. Therefore, any vagueness in the record must be resolved in Ms. Zakarian's favor. Secondly, the record does not only show that she suffered persecution in the 1960s or early in her time in Armenia. As Your Honor noted, there were several times during her testimony where Mrs. Zakarian mentioned that she suffered many – she suffered problems with the government because of her religion many, many times or a lot of times or every time we worshipped, they attacked us. This was noted several times throughout her testimony. So the persecution that she suffered because of her religion was not just at the beginning, but in fact spanned the entire time that she was in Armenia. We ask this Court to reverse the decision of the BIA. Thank you. Thank you very much. The case of Zakarian v. Gonzales is submitted. The remaining cases on the calendar this morning have been submitted on the briefs and we, therefore, are concluded for the morning. Thank you very much. May I just compliment the students on their presentations? A very nice argument. Very well done. Thank you. As well as opposing counsel.
judges: Dw Nelson, Berzon, Mahan